Robert W. BENGTSON, Guardian
ad Litem,

v.

TRAVELERS INDEMNITY COM-
PANY et al.

Civ. A. No. 4667.

United States District Court
W. D. Louisiana, Monroe Division.

June 28, 1955.

Booth, Lockard, Jack & Pleasant, Shreveport, La., Herbert O'Niell, New Orleans, La., for plaintiff.

Theus, Grisham, Davis & Leigh, Monroe, La., Cotton & Bolton, Rayville, La., for defendants.

DAWKINS, Jr., Chief Judge.

The action is one sounding in tort.

In the early morning hours of December 28, 1953, a large truck and van-type semitrailer, owned by Woodrow Avent, a citizen of Arkansas, and being operated by A. L. Pipkin, his duly authorized employee, became disabled while traveling in a southerly direction on U. S. Highway 165, at a point between Olla and Urania, Louisiana. The trouble was with the electrical system, which suddenly failed completely, stopping the motor and extinguishing all lights.

When this happened, Pipkin immediately stopped the vehicle. It came to rest in its right-hand lane of traffic, more or less parallel to the highway center line, with all wheels except one standing entirely upon the 24-foot-wide paved portion of the highway. The right front wheel of the truck was a few inches off the pavement, on the 10-foot-wide shoulder.

The night was dark and a misty rain fell continuously until some time after daylight. Shortly after stopping the vehicle, Pipkin lighted and placed a "Fusee" on the highway to the rear of the trailer. He then removed three pot-type kerosene flares from their carrying case in the truck, lighted them, and placed one in front, one some distance to the rear, and one in the vicinity of the left rear corner of the trailer, near the highway center line.

After tinkering with the vehicle for a while, and being unable to repair the trouble, Pipkin flagged a passing car and hitch-hiked into Olla, hoping to engage a "wrecker" to remove the truck-trailer from the highway. At an all-night drive-in restaurant there, he inquired as to the availability of such service and was advised that he could not get help until daylight. Relying on this advice, which was erroneous (24-hour "wrecker" service was available at Urania, just a few miles away), and instead of returning to his truck to make certain that traffic was protected, he proceeded to a bunkhouse behind the restaurant and went to sleep.

Some three hours later, around 6:25 a. m., while it was still dark and raining, the two rearward flares evidently having been struck and extinguished by earlier passing traffic, a Pontiac automobile proceeding south crashed into the left rear corner of the trailer. Within less than thirty seconds thereafter, a 1950 Ford, being driven by Reverend William H. Bengtson in a southerly direction, also crashed into the trailer, striking its right rear. It was the latter accident which brought about this suit.

Reverend Bengtson's wife and daughters, Dorothy and Margery, were riding as passengers in the Ford, and all three were asleep. Mrs. Bengtson, who occupied the right-hand side of the front seat, was killed almost instantly. Dorothy Bengtson, who was riding on the rear seat with her sister, was thrown violently forward, suffering serious injuries. Margery Bengtson fortunately received only slight physical injuries but sustained severe mental and emotional shock.

Operation of the truck-trailer was insured against public liability by Travelers Indemnity Company (called Travelers), coverage being limited to $10,000 for injuries or death of one person in one accident, and $20,000 for more than one person. Great American Indemnity Company (called Great American) insured

the Ford's operations against public liability, with the same limits of coverage.

When the accident occurred, and when this suit was filed, both of the Misses Bengtson were unemancipated minors, Dorothy being twenty years old, and Margery eighteen years of age. Consequently, they could not sue in their own names for their damages arising from the accident, and had to be represented by an adult duly appointed to press their claims. Accordingly, they presented an *ex parte* application to this Court, in which they stated that no one had been appointed and qualified as their legal tutor or tutrix under Louisiana law, that they desired to have suit filed in furtherance of their claims, and that their older brother, Robert W. Bengtson, was willing to serve and should be appointed as their guardian *ad litem,* pursuant to Rule 17 (c), Fed.Rules Civ.Proc., 28 U.S.C.A., to file and prosecute their causes of action against defendants. An order appointing him to act in that capacity was signed on July 14, 1954, and this suit, brought by him in that representative capacity, was filed against Travelers, Avent and Great American immediately thereafter.

Alleging negligence on the part of both Pipkin and Reverend Bengtson, concurrently and proximately causing the accident, Travelers and Avent are sued, respectively, as the insurer and *respondeat superior* of Pipkin, and Great American is sued directly and alone as the insurer of Reverend Bengtson.[1] Jurisdiction is based upon diversity of citizenship. Plaintiff and his sisters are citizens of Louisiana; all defendants are non-residents. The claims are for damages resulting from the death of their mother and from their own injuries.

After various preliminary motions had been filed and overruled, defendants answered, denying liability. In due course the case was tried to a jury. At the close of plaintiff's evidence, and again at the close of all the evidence, defendants moved for a directed verdict in their favor, on the ground that plaintiff had failed to prove that it was the alleged negligence of Pipkin or Reverend Bengtson, or both, which proximately caused the accident. We reserved judgment, Rule 50(b), Fed.Rules Civ.Proc., and permitted the case to go to the jury. No objection to our charge was made by Travelers; but Great American excepted to our refusal to give a certain special charge requested by it, discussed *infra,* in the precise language of the request.

The jury rendered a verdict for plaintiff, against all defendants, in the sum of $27,500 for the use and benefit of Dorothy Bengtson, and in the sum of $12,500 for Margery Bengtson, a total of $40,000. Prior to submission to the jury all parties had stipulated that, regardless of the size of the verdict, neither insurer, nor Mr. Avent, could be held liable for more than $20,000. Within the permissible delay after entry of the verdict, all defendants renewed their motions for directed verdicts and their original preliminary motions to dismiss for plaintiff's alleged lack of capacity to sue and stand in judgment. They also moved for judgment n. o. v., and alternatively, for a new trial.

We will not burden this opinion with detailed discussion of the motions for directed verdicts and for judgment n. o. v. As stated, they are based upon defendants' contention that plaintiff failed to prove either Pipkin or Reverend Bengtson to have been guilty of negligence, which concurrently and proximately caused the accident. Considering plaintiff's evidence, as we must, from the most favorable point of view, the jury reasonably could have concluded, and evidently did, that Pipkin was guilty of negligence, which continued to the moment of the accident, in failing to return to the scene and protect traffic against the danger presented by his stalled vehicle, as required by the Louisiana Highway Regulatory Statute. In

---

1. Under the Louisiana Direct Action Statute, LSA–R.S. 22:655; Lumbermen's Mutual Casualty Co. v. Elbert, 348 U.S. 48, 75 S.Ct. 151; Watson v. Employers Liability Assurance Corporation, Ltd., 348 U.S. 66, 75 S.Ct. 166.

placing the flares, Pipkin performed only half of his duty, for he also was required to protect traffic until the vehicle was removed. If he had been at the scene, instead of asleep in the bunkhouse at Olla, he at least could have moved the one remaining useful flare from the front of the truck to the rear, where the greatest danger to the traveling public was presented. Likewise, the jury reasonably could have concluded, and evidently did, that Reverend Bengtson was guilty of negligence proximately causing the accident in failing to operate his car under such control and at a rate of speed wherein he could have stopped it within the distance he actually could see ahead, and in time to avoid the accident, after he had been blinded for several seconds by the headlights of two cars proceeding from the opposite direction. These were jury questions, pure and simple, and we are powerless to disturb its findings.

Accordingly, the motions for directed verdicts, and for judgment n. o. v., must be and are hereby Overruled.

Defendants earnestly urge their motions to dismiss for plaintiff's alleged lack of capacity to sue and stand in judgment. They contend that the rule in Louisiana, unlike that of many other States, is that minors may be represented in actions brought for or against them in Court *only* by a tutor or tutrix duly appointed and qualified under Louisiana law by the State Court of their domicile. They argue further that, because of this rule, which they say is substantive in nature and binding upon us, Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, this Court had no power to appoint Robert W. Bengtson as guardian *ad litem* for these minors. Accordingly, they contend that the attempted appointment was an absolute nullity and that these entire proceedings must be stricken and dismissed.

In support of their position, they cite certain articles of the Louisiana Code of Practice, reading as follows:

Article 958: "There shall hereafter be no curator ad bona or curator ad litem appointed in any case; the persons and estates of minors shall in all cases be placed under the power of tutors and under-tutors; and the powers, duties and responsibilities of tutors and under-tutors, as well as the liability to be removed from office, shall continue until the minor or minors attain the age of majority, or are otherwise emancipated."

Article 108: "Minors, persons interdicted or absent, can not sue, except through the intervention or with the assistance of their tutors or curators."

Article 109: "Tutors act themselves in all judicial proceedings, in the name of their minors, and in all suits which may be brought for them, without making them parties to said suits."

Defendants also rely upon the following articles of the Louisiana Statutes Annotated—Civil Code:

Article 246: "The minor not emancipated is placed under the authority of a tutor after the dissolution of the marriage of his father and mother."

Article 250: "Upon the death of either parent, the tutorship of the minor children belongs of right to the other. * * *

"All those cases are called tutorship by nature."

Article 301: "The causes herein expressed, or any other, cannot excuse the father from the obligation of accepting the tutorship of his children."

Article 273: "In every tutorship there shall be an under-tutor, whom it shall be the duty of the judge to appoint at the time the letters of tutorship are certified."

Article 337: "The tutor shall have the care of the person of the minor, and shall represent him in all civil acts."

Also cited and quoted from in defendants' briefs are a number of Louisiana decisions interpreting these articles.[2]

Defendants also urge upon us a number of federal decisions,[3] decided under the old Conformity Act before the Federal Rules of Civil Procedure were adopted, as well as several federal decisions, and textbook authorities,[4] interpreting Rule 17(c), Fed.Rules Civ.Proc., and holding generally that the law of the State in which the Federal District Court is sitting is determinative of the capacity of a representative to sue or be sued.

Plaintiff, in opposition, contends that the Louisiana Codal articles relied on by defendants are purely procedural, not substantive, and, therefore, that the issue must be decided according to the provisions of Rule 17(c), which were followed in having plaintiff appointed as guardian *ad litem* here.

We agree with plaintiff. It was the minors' claims for damages, not how they would be asserted for them, which were and are substantive. If the suit had been brought in the State Court, of course Louisiana's procedural laws must have been followed; but being a federal action, the procedural rules of the forum control.[5]

The Louisiana Code of Practice, in its very name and nature, is an adjective body of laws. The Louisiana Civil Code, while dealing principally with substantive rights and obligations, also is replete with procedural rules. All of the articles from both Codes, relied on here by defendants and quoted above, obviously are procedural; and the Louisiana cases cited by defendants consequently are limited in effect to State Court, not federal, litigation.

The earlier federal decisions, cited in footnote 3, supra, for the most part were based upon the Conformity Act, formerly 28 U.S.C.A. § 724, which required that federal Courts, in actions at law, follow as nearly as possible the rules of practice prevailing in the States in which they were sitting. With the adoption of the Federal Rules of Civil Procedure, abolishing the former distinction between equitable and legal actions and estab-

2. Farr v. Emuy, 121 La. 91, 46 So. 112, 15 L.R.A.,N.S., 744; Heno v. Heno, La. Sup., 9 Mart.,O.S., 643; Lamkin v. Succession of Filhiol, 123 La. 181, 48 So. 881; Gilbert v. Mazerat, 121 La. 35, 46 So. 47; Wheeler v. Rodriguez, 126 So. 715; Koepping v. Monteleone, 143 La. 353, 78 So. 590.

3. Parsons v. Bedford, 3 Pet. 433, 28 U.S. 433, 7 L.Ed. 732; Atlantic & Pacific R. Co. v. Hopkins, 94 U.S. 11, 24 L.Ed. 48; State of Florida v. Anderson, 91 U.S. 667, 23 L.Ed. 290; Barrett v. Virginian R. Co., 250 U.S. 473, 39 S.Ct. 540, 63 L.Ed. 1092; Pritchard v. Norton, 106 U.S. 124, 1 S.Ct. 102, 27 L.Ed. 104; Nudd v. Burrows, 91 U.S. 426, 23 L.Ed. 286; Robertson v. Perkins, 129 U.S. 233, 9 S.Ct. 279, 32 L.Ed. 686; Richter v. East St. Louis & S. Ry. Co., D.C., 20 F.2d 220.

4. Southern Ohio Savings Bank & Trust Co. v. Guaranty Trust Co. of New York, D.C., 27 F.Supp. 485; Cooper v. American Airlines, 2 Cir., 149 F.2d 355, 162 A.L.R. 318; Fallat v. Gouran, 3 Cir., 220 F.2d 325; Fins, Federal Practice Guide; Cyclopedia of Federal Procedure, 3rd Ed., Vol. VI, p. 451, et seq.; Edmunds, Federal Rules of Civil Procedure, Vol.

II, p. 751, et seq.; West's Federal Forms, Vol. 3, p. 5, et seq.

5. Montgomery Ward & Co. v. Callahan, 10 Cir., 127 F.2d 32; See also Occidental Life Ins. Co. of California v. Kielhorn, D.C., 98 F.Supp. 288, 293:
"Under the holding in Guaranty Trust Co. of New York v. York, supra, 326 U.S. [99] at page 109, 65 S.Ct. [1464] at page 1470, 89 L.Ed. 2079, the following test should be applied in determining whether or not a Federal court in a diversity suit should follow a State law: If the law does 'significantly affect the result of a litigation' and 'the outcome of the litigation,' it constitutes the substantive law of the State and should be followed. However, if it 'concerns merely the manner and the means' by which the rights of the parties are determined, it is the procedural or adjective law of the State and need not be followed. In Sibbach v. Wilson & Co., Inc., 312 U.S. 1, at page 14, 61 S.Ct. 422, at page 426, 85 L.Ed. 479, the court said: 'The test must be whether a rule really regulates procedure,—the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them.'"

lishing uniform rules of procedure in all federal Courts, the Conformity Act in effect was repealed[6] and the rationale of decisions based upon it was nullified.

We think the meaning of Rule 17, in so far as it is here applicable, is clear: If a general guardian (tutor) for a minor already has been appointed and qualified by a State Court, and he seeks to act as such in a federal Court, his appointment and qualifications as such are tested by the procedural law of the State of his appointment.[7] To this extent we agree with defendants and the cases they have cited, footnote 4, supra. If, however, a minor having a cause of action which he wishes to assert does not have a validly appointed and qualified general guardian (tutor), the federal Court in which the suit is brought may appoint a guardian *ad litem* or next friend to represent him in prosecuting the action.[8]

Accordingly, on the basis of the authorities cited above, the renewed motion to dismiss for lack of capacity to sue must be, and is hereby Overruled.

As stated, Great American excepted to our failure to give a certain special charge to the jury in the exact language of its request, which read as follows:

"(1) In your consideration of this case, where there is no statutory law on a subject, the court and jury may adopt theoretical standards from common sense experience for insuring the safety of the road, but all must be tested by concrete factors, the law and the evidence. The letter of the law must not be disregarded under a pretext of pursuing its spirit.

"(2) *It is common knowledge* to all who operate motor vehicles at night *that the headlights of such vehicles will not reveal objects on the highway beyond the locus of an oncoming vehicle that also has bright headlights.* In such a situation no one (Rev. Bengtson in this case) is expected or required to reduce the speed of his car to such extent that it could be stopped within *the short distance between him and the trailer after its presence on the highway was discovered. To have effectively guarded against the emergency that did confront him he would have had to proceed at a snail-like pace or have brought his car to a complete stop.* The law does not expect this of a motorist under such circumstances. *He did not and surely would not be expected to anticipate that the road * * * would be blocked as it was.*

"(3) The question of Reverend Bengtson's negligence or lack of negligence is a question for the jury to determine.

"(4) In considering this, you are requested to determine whether or not his acts were of such lack of care as to be a proximate cause of the collision. If not, the insurer of Reverend Bengtson's automobile is not liable in damages to this plaintiff."

We again have reviewed our charge and find that we actually instructed the jury, in what we believe to have been

---

**6.** See "Commentaries", "Prior Law", following Rule 1, Fed.Rules Civ.Proc., 28 U.S.C.A. p. 168: "In the first place the effect of the rules has been to eliminate the Conformity Act." 45 W.Va.L.Q. 5.

**7.** 3 Moore's Federal Practice 1417; 2 Barron and Holtzoff, §§ 484–488; cf. Fallat v. Gouran, 3 Cir., 220 F.2d 325, 328: "Rule 17(c), however, apparently gives a guardian the right to sue in the federal courts *irrespective* of his capacity under state law."

**8.** 3 Moore's Federal Practice 1419; Montgomery Ward & Co. v. Callahan, supra, Note 5; Constantine v. Southwestern Louisiana Institute, D.C., 120 F.Supp. 417; See also Zaro v. Strauss, 5 Cir., 167 F.2d 218; Gas Service Co. v. Hunt, 10 Cir., 183 F.2d 417; Du Vaul v. Miller, D.C., 13 F.R.D. 197; Westcott v. U. S. Fidelity & Guaranty Co., 4 Cir., 158 F.2d 20; C. J. Peck Oil Co. v. Diamond, by Bond, 5 Cir., 204 F.2d 179; Hurwitz v. Hurwitz, 78 U.S.App.D.C. 66, 136 F.2d 796, 148 A.L.R. 226.

more impartial language, as to the essence of paragraphs 1, 3 and 4 of the request.

It will be noted at once that the second paragraph of the requested charge is so strongly slanted in favor of Great American that our giving it would have been tantamount to instructing a verdict for that defendant. Its counsel seeks to counter that criticism by stating that this language was taken almost verbatim from two fairly recent Louisiana appellate decisions. Be that as it may, counsel has overlooked the Louisiana rule that its appellate Courts must review both factual and legal findings of the lower Courts, and more often than not make statements in their opinions which are a mixture of fact and law.[9] The language we have emphasized amply demonstrates this point.

Instead of this specially requested charge, we instructed the jury as follows:

"Now, some general principles regarding the rules of the road in Louisiana: Operators of vehicles are required by law to maintain a careful and proper lookout ahead and must always keep their vehicles under careful and proper control. While a motorist may assume ordinarily that all persons using the highway upon which such motorist is then operating his car will exercise ordinary care, it is the duty of the driver to look ahead and to see anything in the line of his vision which will affect his use of the highway. He has no right to assume that the highway is clear, but under all circumstances and at all times he must be vigilant and must anticipate the presence of others. In the eyes of the law, every person is held to have seen what he reasonably could have seen, whether he actually saw it or not.

"If a motorist saw, or by the exercise of ordinary care and prudence, should have seen, an object upon the highway in time to avoid running into it, and fails to do so, then he may be said to have been guilty of negligence in not maintaining a proper lookout, or in driving at a rate of speed greater than that at which he could stop within the range of his vision.

"There is a legal presumption of negligence on the part of a motorist who saw, or should have seen, a stationary object on the highway in time to avoid it, and yet runs into it. This is a rebuttable presumption, however, and if it is shown by a preponderance of the evidence that there were unusual circumstances involved, so that a reasonable, prudent person, maintaining a proper lookout, would not have observed it in time, then he may not be said to have been guilty of negligence for failure to stop or turn aside so as to avoid the accident. Where a motorist's vision is obscured or impaired by headlights of vehicles approaching from the opposite direction, or by weather conditions, or otherwise, he must reduce his speed so as to be able to stop within the distance illuminated by his headlights.

"Of course, if a driver's vision is suddenly and unexpectedly obscured, or he is temporarily blinded, through causes which he, as a reasonable, prudent person, could not have anticipated, he is not held to the same high degree of care but may be said to have been placed in an emergency, the legal meaning of which we will explain to you shortly. Naturally, the degree of care to which any driver is held varies with the circumstances: the greater the apparent danger, the higher degree of care that is required. Where a driver is confronted with a sudden emergency not of his own making and to which he did not contribute, he cannot be held responsible for the same degree of care required

---

9.  Louisiana Constitution of 1921, Article VII, §§ 2, 10, LSA.

under ordinary circumstances, and cannot be held responsible or liable for errors of judgment committed by him in the emergency, where he is compelled to act instantly in an effort to avoid an impending accident. In such circumstances, he may not be said to be guilty of negligence if he makes such a choice as a person of ordinary prudence would have made, even though he did not make the wisest choice and one which would have been required in the exercise of ordinary care but for the emergency.*

We believe this to have been an accurate statement of Louisiana law.

Moreover, the second paragraph of the requested charge fails to take into account all of the peculiar circumstances involved in this particular accident, such as the weather, visibility, road conditions, etc., and, as stated by the appellate Court for this Circuit in a case relied on by Great American, Car & General Insurance Co. v. Cheshire, 159 F.2d 985, 988, "* * * In each case the particular facts and circumstances must be considered and, 'in the final analysis, the facts of each case will determine the question of negligence'. * * *" This we instructed the jury to do:

"A proper decision of each case depends upon its own peculiar circumstances and the driver's acts are classified as negligent or non-negligent, depending upon whether he conducted himself in those circumstances as a reasonably prudent person would have acted."

The refusal to give this specially requested charge having been included as one of the grounds for Great American's motion for judgment n. o. v., which we already have overruled, it is unnecessary that we take further action upon the point.

 Both defendants alternatively pray for a new trial on the ground that the awards were excessive, as resulting from passion or prejudice on the part of the jury. Considering that both girls lost their mother in this accident, that Dorothy Bengtson sustained, among other injuries less serious, a fractured skull resulting in frequent headaches, severe lacerations of her forehead producing ugly scars clearly visible across the Courtroom, and the loss of nine front teeth; that Margery Bengtson was younger and entitled to a greater award for the death of her mother than was her sister, and that, in addition to general contusions and resultant pain, she suffered great mental and emotional shock, it is our opinion that the verdict was not excessive in any respect, certainly not to the point where it "shock[s] the judicial conscience".[10] Consequently the motions for a new trial must be Denied.

Accordingly, for the reasons given, all pending motions by both defendants are Overruled and Denied.

---

10. Shehee v. Aetna Casualty & Surety Co., D.C., 122 F.Supp. 1, 2; 15 Am.Jur. 622, §§ 205.